

# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | | |
|---|---|---|
| LISA M. RALLO, | ) | No. ED101746 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Hon. John P. Banas |
| PETE S. RALLO, | ) | |
| | ) | Filed: |
| Appellant. | ) | June 2, 2015 |

This appeal arises from the judgment dissolving the marriage of Lisa Rallo ("Wife") and Pete Rallo ("Husband"). Husband challenges venue, the custody determination, the division of property and attorney fees. We affirm.

Husband and Wife were married in 2006. Wife was pregnant with a son at the time, and Husband was not the natural father. The son was born during the marriage and adopted by Husband. Husband and Wife also had a daughter together a year later. Husband, Wife and the children lived in the City of St. Louis. In December of 2011, Wife and the children moved to her grandparents' home in St. Charles County. A month later, she filed a petition for dissolution in St. Charles County. Husband filed a motion to dismiss or to transfer based on improper venue. That motion was denied, and after failed attempts at mediation the case eventually proceeded to trial in 2014. At that point, the son was eight and the daughter was seven.

The parties were awarded joint legal custody of the children, and Wife was given final decision-making authority and sole physical custody. The trial court found both parties were unemployed, but imputed a minimum wage income to Husband based on his lengthy history of employment at Schnucks. The trial court divided the parties' limited marital property, which

included Husband's Schnucks pension and excluded a 2011 tax refund. The court granted Wife's request for attorney fees, but ordered Husband to pay only half of the amount requested. Further facts and details will be developed in the discussion of each point.

In his first point, Husband claims that venue was not proper in St. Charles County and the trial court should have dismissed the case or transferred it to the City of St. Louis where the parties resided during the marriage. Where, as here, the venue ruling depended on factual matters and the inferences to be drawn therefrom, we review for an abuse of discretion. See McCoy v. The Hershewe Law Firm, P.C., 366 S.W.3d 586, 592 (Mo. App. W.D. 2012). We find no abuse of discretion because venue was proper in St. Charles County.

Section 452.300.5 provides that dissolution proceedings "shall be commenced in the county in which the petitioner resides." Our courts have held that the term "resides" in this and other provisions of the dissolution statute is equivalent to "domicile." See Byars v. Byars, 593 S.W.2d 656, 658 (Mo. App. S.D. 1980); State ex rel. Henderson v. Blaeuer, 723 S.W.2d 589, 590 (Mo. App. W.D. 1987); see also Lindo-Higginbotham v. Higginbotham, 9 S.W.3d 620, 621-23 (Mo. App. E.D. 1999) ("resident" in section 452.305 equivalent to "domiciled"). A domicile is a person's "true, fixed and permanent home and principal establishment to which, whenever he is absent, he has the intention of returning." Byars, 593 S.W.2d at 658. To establish residency, it must be shown that Wife was actually present in St. Charles County and intended to remain there, either permanently or for an indefinite time, without any fixed or certain purpose to return to her former abode in the City of St. Louis. See Higginbotham, 9 S.W.3d at 621. In determining a person's intent regarding her residence, we consider "the acts and utterances of the person . . . before, at, and after the time the domicile is in dispute." Wambugu v. Wambugu, 896 S.W.2d 756, 757 (Mo. App. E.D. 1995). If intent is established by other evidence, then the duration of the person's bodily presence in the place is of little importance. Goeman v. Goeman, 833 S.W.2d 476, 478 (Mo. App. W.D. 1992).

2

Here, there is no dispute that Wife lived in St. Charles County at the time she filed the petition for dissolution. There was also substantial evidence in the record—including Wife's own statements—that she intended to live in St. Charles County indefinitely. At the time of trial, Wife still lived at the grandparents' residence and had lived there continuously, except for a few months when she moved to another location in St. Charles County with her boyfriend. Husband's argument focuses on this brief absence from the grandparents' home and on Wife's testimony that she did not intend to remain at her grandparents' home "at first" and, at some point, had hoped to move to St. Louis County with her boyfriend. But those facts do not support Husband's contention that St. Charles County was not her residence at the time of filing; they merely demonstrate Wife's desire to, at some point, live independently from her grandparents, which she first attempted to do within St. Charles County. Although she may have hoped to move to another county someday, her testimony at trial indicated her intention—despite her earlier hopes—to remain at her grandparents' home in St. Charles County indefinitely to care for them. There was no evidence that Wife ever intended to return to the City of St. Louis. These utterances and actions—before, during and after the move to her grandparents' home—support the conclusion that Wife was a resident of St. Charles County for purposes of venue in this dissolution action.

Husband's motion to dismiss for lack of proper venue included an alternative request to transfer the case to the City of St. Louis, where he resided, under section 452.300.5. Husband has wholly failed to develop any argument to support this issue in his brief on appeal. He points to no evidence in the record to establish—and makes no argument regarding—either of the grounds on which the trial court would have had discretion to transfer this case to Husband's county of residence. See section 452.300.5(1) and (2) (children resided there for ninety days prior to petition or transfer serves best interest of children).

Point I is denied.

In his second point, Husband challenges the trial court's custody decision. This judgment must be affirmed unless it is unsupported by substantial evidence, is against the weight of the evidence, misstates or misapplies the law. Thorp v. Thorp, 390 S.W.3d 871, 877 (Mo. App. E.D. 2013). A trial court's custody determination is afforded greater deference than other decisions. Id. In fact, we presume that the trial court reviewed all of the evidence and based its decision on the child's best interests. Id. We view the evidence and any reasonable inferences therefrom in the light most favorable to the judgment—disregarding contradictory evidence—but we will not reweigh the evidence. Id. We defer to the trial court's credibility determinations on appeal because of its superior position to observe the sincerity and character of witnesses, as well as other intangibles not evident from the record. Mehler v. Martin, 440 S.W.3d 529, 534 (Mo. App. E.D. 2014). The trial court's decision is afforded great deference, even if the evidence may have supported another conclusion. Thorp, 390 S.W.3d at 877. In sum, we must affirm a custody determination unless we are firmly convinced that the welfare of the child requires an alternative arrangement. Id.

In its judgment, the trial court expressly stated that it had considered the public policy stated in Section 452.375.4: that both parents have "frequent, continuing and meaningful contact" with the children as long as it is in the children's best interest. The court also listed each of the specific factors set forth in section 452.375.2(1)-(8) and stated its findings thereon underneath. Section 452.375.2 provides, in relevant part:

> The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:
>
> (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
> (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
> (3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

4

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
(5) The child's adjustment to the child's home, school, and community;
(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. . . .
(7) The intention of either parent to relocate the principal residence of the child; and
(8) The wishes of a child as to the child's custodian.

Having considered these factors, the trial court concluded that joint legal custody was in the best interest of the children and ordered Husband and Wife to confer with one another regarding decisions about the children. The court noted that the parties had difficulty communicating and reaching consensus in the past; therefore, it ordered that if Husband and Wife cannot agree after good faith efforts to communicate, then Wife will make the final decision.

The trial court awarded sole physical custody of both children to Wife, noting that she had been the primary caretaker from birth—both during the marriage and since the separation—up to the time of trial. The court listed Wife's extensive involvement in all of the children's educational and medical needs. It granted Husband three hours of visitation on a weekday evening with advance notice to Wife, but eliminated the weekday overnight visits from the parenting plan at Husband's request. Husband continued to have alternating weekend visitation, as he did during the separation.

Husband argues that there was evidence that Wife had made unilateral decisions about the children's education and health care during the separation without consulting him. He claims this demonstrates that giving Wife ultimate decision-making power in the event of irreconcilable differences was against the weight of the evidence and that giving Wife sole custody was not in the children's best interests. Wife testified, however, that communication with Husband about these decisions was "pretty bad." Husband was hard to get a hold of because he claimed not to have a phone. Instead, Husband told Wife to communicate with him by calling his parents'

5

home, where she would leave a message with his mother and then it sometimes would take him days to return the call.  Husband hardly ever initiated contact with Wife.  Wife testified she was willing to continue communicating and trying to reach agreement about those decisions.  She also said, however, that mediation had failed in the past and was not something they could afford.  Therefore, she asked to be made the final decision-maker in the event she and Husband faced irreconcilable conflict. She did not ask for sole legal custody.  Husband admitted that Wife had been communicating with him via his parents.  At the time of trial, he said he had a cell phone and would prefer her to call or text him.  Yet, he had not given her the number at that point and claimed he could not give it to her in the courtroom because he did not have it on him.

Husband also contests the court's reliance on Wife's role as primary caretaker as a factor in awarding her sole physical custody.  He claims that the court misapplied the law because section 452.310.4 forbids giving preference to the parent in "actual possession of the child at the time of filing."  But the court did not cite Wife's *possession* of the children as a factor in awarding her sole custody.  Instead, it relied on the required statutory factors and her role as the children's primary caretaker from their birth through the time of trial.  Husband also claims that whether a parent is the "primary caretaker' is not a factor set forth in 452.375.4.  But the parent's "interaction and interrelationship" with the child is a factor, and a parent's role as primary caretaker is relevant thereunder.  See section 452.375.4(3).  Finally, Husband contends that there was insufficient evidence to support the conclusion that Wife was the primary caretaker, citing only to the fact that Husband took care of the kids—sometimes alone and sometimes with help from his parents—during the times that Wife worked during the marriage.  That evidence alone does not refute or outweigh the other substantial evidence demonstrating Wife's extensive involvement with and primary responsibility for the children their entire lives. Wife testified that she took care of all the children's doctors' appointments, including the many tests their son needed for his autism and ADHD; she was the primary communicator with the children's school

6

and was present at all school meetings, while Husband only came sometimes; she cooked for the family and took care of bathing the children. The conclusion that Wife was the primary caretaker is more than supported by the evidence.

Husband also contests the findings the court made under the factors set forth in Section 452.375.2.[1] He first takes issue with the findings under subsections (1) and (2). Under subsection (1), the trial court found that Husband had acknowledged he consistently chose not to exercise weekday overnight visits with the children, which the court said "calls into question his sincerity" as to his request to be sole custodian. Similarly, under subsection (2)—regarding his willingness to carry out the proposed parenting plan and actively perform his duties—the court noted again that Husband frequently missed his visitations. Husband claims the court erroneously found him insincere based on settlement discussions in which Husband may have indicated a desire for split custody of the children. But Husband points to nothing in the record to support this contention.

Moreover, the court's determination that Husband's desire for sole custody and willingness to take on that responsibility were of questionable sincerity was based on Husband's own testimony that he repeatedly and consistently did not exercise his right to weekday visits during the separation because of the traffic between St. Louis and St. Charles. Contrary to Husband's claim in this brief, he was not *unable* to carry out these visits. Rather, he simply *chose* not to visit because it was too hard. He also testified that he wanted a few hours of weekday visits in the future if Wife was awarded custody, but not overnight, and he did not intend to actually engage in those visits in the near future because of the travel issues; he just wanted that visitation in place in case he changed his mind. The trial court was free to make inferences from all of this testimony about Husband's willingness to actively perform his

---

[1] Husband claims the court's findings on these factors were not detailed or specific enough. We disagree. The court set forth each factor and then made findings on—or indicated there was no relevant evidence relating to—each factor. This is all that is required. See Keel v. Keel, 439 S.W.3d 866, 878 (Mo. App. E.D. 2014) (sufficient findings on relevant factors enough, no need for detailed findings on every factor).

functions as the sole custodian of the children as he requested. On this factor, Husband also claims that there was substantial evidence that Wife alienated the children from him, but does not cite to any specific place in the record where such evidence is contained, except to refer again to how far away she moved from him and his alleged exclusion from school decisions. To the extent any of that evidence contradicts the custody determination, we disregard it on appeal. The findings on subsections (1) and (2) were supported by sufficient evidence.

As to subsection (3), the trial court found that Husband occasionally had difficulty controlling his son and would contact Wife to help calm the son down. Husband claims there was no evidence that he had trouble controlling his son, only that he sometimes had to ask Wife about the son's medication. This argument is belied by the record. Wife testified, in the context of their history of poor communication, that Husband only called her if he had questions about the son's medicine. Later, however, she also testified that when Husband had the children on weekends, Husband called her about the son's behavior—that the son was yelling, screaming and throwing a tantrum—and told Wife he thought the son needed to go to the hospital because Husband could not control him. Wife had to drive to Husband's house during a visit to get the son calmed down on at least one occasion. This was sufficient to support the trial court's finding that "on occasions" Husband had trouble controlling the son.

Finally, Husband contests the findings under subsection (5), in which the court noted that the uncontroverted evidence showed the children had adjusted to life in St. Charles County. He claims that the trial court erroneously failed to consider Wife's multiple relocations and evictions, which he contends proves Wife is unable to provide a stable environment and therefore giving her sole physical custody is not in the children's best interest. But these arguments contain no reference to a particular place in the record containing such evidence of instability. Moreover, to the extent it is contradictory evidence, we disregard it on appeal.

Husband does not challenge any of the trial court's other findings on the statutory factors: namely that neither party intended to relocate under subsection (7); that there was no evidence of parental interference with each other under subsection (4) or health issues under subsection (6); and that it did not consider the wishes of the children under subsection (8) because they were too young to be interviewed.

In sum, there was substantial evidence to support the trial court's award of joint legal custody, with ultimate decision-making in the event of irreconcilable differences to Wife, and the award of sole physical custody to Wife. The trial court's findings were not against the weight of the evidence, and the court made no error of law. Husband has failed to firmly convince us that the children's welfare requires a different custody arrangement than what the trial court ordered.

Point II is denied.

In the next few points, Husband challenges different aspects of the trial court's division of marital property. The trial court has broad discretion in dividing marital property. Valentine v. Valentine, 400 S.W.3d 14, 23 (Mo. App. E.D. 2013). We will not interfere with the trial court's distribution of marital property unless "the division is so heavily and unduly weighted in favor of one party that it amounts to an abuse of discretion." Id. at 23-24. We presume the trial court's division is correct and require the party challenging the division on appeal to overcome that presumption. Id. at 24.

In the third point, Husband argues that the parties' 2011 tax refund was presumed to be marital property and should have been included in the trial court's division thereof. Wife had received that refund and states that it had been spent by the time of trial. Husband argues—for the first time in his reply brief on appeal—that Wife squandered the money from the tax refund, which should count against her in the division of property.

A court cannot include the value of a marital asset that no longer exists in its division of marital property when one spouse has used that asset for her living expenses during the

9

separation. <u>Loomis v. Loomis</u>, 158 S.W.3d 787, 790-91 (Mo. App. E.D. 2005). But if that spouse secretes or squanders the property in anticipation of divorce, the court may order reimbursement. <u>Id</u>. at 791. As Husband's own case citation reveals, it was *his* burden to produce evidence demonstrating that this tax refund was secreted or squandered:

> [A] spouse, claiming that a marital asset is being secreted or was squandered by the other spouse in anticipation of a dissolution proceeding, must *introduce evidence demonstrating that there existed at some point a marital asset, which is being secreted or was squandered*. Once such evidence is introduced, while the burden of proof remains with the spouse claiming that the other has secreted or squandered the marital asset in question, the burden of going forward with the evidence shifts to the other spouse to account for the claimed secreted or squandered asset by presenting evidence as to its whereabouts or disposition.

<u>Farnsworth v. Farnsworth</u>, 108 S.W.3d 834, 841 (Mo. App. W.D. 2003) (emphasis added) (internal quotation marks omitted) (citing Conrad v. Conrad, 76 S.W.3d 305, 316 (Mo. App. W.D. 2002)).

There is no dispute that Wife received the tax refund in the amount of $6,285 and that it was marital property. Although Husband requested during his testimony that the Court include the tax refund in its division of marital property, he never claimed at trial that the funds remained or that Wife had secreted or squandered those funds. Moreover, he presented no evidence to that effect or any evidence to refute Wife's testimony that she used part of the refund to pay Husband's personal property tax and offered him the remainder of his share of the refund, which he refused. Wife was not asked what happened to the tax refund, but court documents indicated her limited income and assets, from which the trial court could have inferred that she used the tax refund for her daily living expenses. Under these circumstances, Husband has failed to overcome the presumption that the trial court's division of property correctly excluded the non-existent remains of the 2011 tax refund. <u>See</u> <u>Conrad</u>, 76 S.W.3d at 316.[2]

---

[2] Moreover, the trial court expressly took into account the fact that Husband had not received any of that refund when it ordered him to pay only half of Wife's requested attorney fees. This further exemplifies that the trial court was not acting arbitrarily, but instead carefully crafted its judgment equitably.

Point III is denied.

In his fourth point, Husband contends that a portion of his Schnucks pension was non-marital property because he had begun accumulating some of those benefits before the marriage. Retirement benefits are considered marital property and are subject to division, unless they were accumulated prior to the marriage. Valentine, 400 S.W.3d at 24. Husband had the burden at trial to prove by clear and convincing evidence which portion of the pension was accumulated before the marriage. See Kelly v. Kelly, 340 S.W.3d 673, 679 (Mo. App. W.D. 2011); see also Valentine, 400 S.W.3d at 25.

Husband claims that the pension plan retirement summary he submitted to the trial court shows that he "began accruing pension benefits in 2000," six years before the marriage. That document lists the total hours he worked each year and a variety of subcategories of hours with abbreviated headings such as "std/pref hours" and "sup/def hours." It also contains columns for listing a variety of credits: "clerk credits," "supp/spec credits," "pension credits," "vesting service" and "eligibility credits." Beginning in 2000, the document lists "0", ".75" or "1" in those credit columns for the remaining years of his employment. The document also shows the total hours and credits for his nineteen years of employment and lists his total retirement at the time of trial as $475. The only other evidence relating to his pension was Husband's testimony. He said that the retirement plan was not applicable when he first started at Schnucks because he only worked part-time. He started working full-time about a year before he lost his job, which was during the marriage. Husband testified that retirement benefits "started kicking in" when he started working full-time, which occurred exclusively during the marriage and not before.

Husband provided the trial court with no information—much less clear and convincing evidence—from which it could determine which portion of the pension had accrued before the marriage. At best, the pension summary suggests that Husband had some "pension credit" prior to the marriage, but neither the document on its face, nor any other evidence, revealed the

meaning of those credits or any other information in that document. Under these circumstances, Husband failed to meet his burden of proof at trial and to overcome on appeal the presumption that the trial court's decision about the pension was correct. See Garrison v. Garrison, 255 S.W.3d 37, 43 (Mo. App. W.D. 2008).

Point IV is denied.

In his fifth point, Husband merely reiterates the arguments in the above points, claiming that the division of marital property was not equitable because of the erroneous exclusion of the 2011 tax refund and inclusion of the entire pension. For the same reasons discussed above, we disagree.

Point V is denied.

In his sixth point, Husband contests the fact and the amount of the trial court's imputation of income to him. "[T]he imputation of income is entirely discretionary, and what constitutes appropriate circumstances to impute income will depend on the facts and must be determined on a case-by-case basis." Aubuchon v. Hale, 453 S.W.3d 318, 243 (Mo. App. E.D. 2014) (internal quotation marks omitted). We will not reverse absent a manifest abuse of that discretion. Hoffman v. Hoffman, 423 S.W.3d 869, 876 (Mo. App. E.D. 2014). Here, the trial court found as follows with respect to Husband's employment:

> [Husband] has been unemployed since being released from his job at Schnucks. Although [he] has testified that his ankle sometimes swells to a point where he considers himself unemployable, he acknowledges that his application for Social Security Disability has been rejected. [Husband] testified that he has had an Appeal pending on his Social Security application but has not yet had any hearing on that Appeal. In the meantime, [he] freely testified that he has not sought employment nor is he currently seeking employment since it is his understanding that in the event he accepts employment he would be disqualified from his Social Security Disability application. The Court finds this testimony troubling.

Then, considering his long employment with Schnucks, both parties' testimony and "the lack of any medical evidence" about Husband's inability to work, the court imputed to Husband an income of $7.50 per hour, which is minimum wage, for forty hours a week.

"The purpose of imputing income is to prevent a parent from escaping responsibility to his or her family by deliberately or voluntarily limiting his or her work to reduce income." Hoffman, 423 S.W.3d at 876-77. In proper circumstances, the court may impute income according to what that person could earn using best efforts to gain employment suitable to his or her capabilities. Id. at 877. "Proper circumstances" include situations where a parent has voluntarily reduced income without justification or has lost a job involuntarily but has failed to use best efforts to secure new employment, refused offers of employment or failed to demonstrate that unemployment was temporary. Id.; see also Form 14, line 1, comment H.[3] Husband contends that there was no evidence that he was intentionally avoiding work and, therefore, the trial court's findings are "completely against the uncontroverted facts." We disagree.

First, the only evidence regarding the conditions Husband claims prevent him from working came from Husband's own description thereof. The trial court was free to make its own inferences regarding the extent to which that condition actually affected Husband's ability to work. Moreover, although he applied for a job at two other grocery stores a year before the trial, he had not made any effort to secure employment since then; he testified that he was told that he was not allowed to work while waiting on the appeal of the denial of his request for disability benefits. It was within the trial court's discretion to infer from this testimony that Husband was

---

[3] That comment states:

> When determining whether to include imputed income and, if so, the amount to include in a parent's "gross income," a court or administrative agency shall consider all relevant factors, including:
>> (1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;
>> (2) The parent's occupational qualifications;
>> (3) The parent's employment potential;
>> (4) The available job opportunities in the community; and
>> (5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

choosing not to work and was not completely incapable of working. In fact, Husband agreed that there are certain types of jobs he could do with his alleged disability.

Wife's testimony further supports the court's conclusions. She acknowledged that Husband had arthritis, which caused problems at work during the marriage "here and there, short periods of time." Wife said Husband's ankle would swell up, but only a couple of times a year. Wife said Husband never took a substantial medical leave from Schnucks because of his condition, needing at most only a few days or a week off. She did not know whether his condition had affected work since the separation, but had no reason to believe the condition had worsened.

This evidence supports the conclusion that Husband had not used his best efforts to secure new employment. Husband has failed to demonstrate a manifest abuse of the trial court's wide discretion to impute income under the circumstances of this case.

Husband also contests the amount of imputed income. Wife had asked that Husband be imputed income of $12 per hour for forty hours a week—which is the hourly rate Husband was earning at the end of his employment with Schnucks—but the court ordered only $7.50 per hour. Husband contends the trial court failed to consider that Husband had not completed high school or the available job opportunities in the community. But having determined that Husband was actually capable of some full-time employment—and considering that Husband had been able to maintain a job in some capacity for the entire marriage at as much as $14 per hour—there was sufficient evidence to support imputing at least minimum wage. In fact, it may have been an abuse of discretion *not* to have imputed at least minimum wage under these circumstances. See Voinescu v. Kinkade, 270 S.W.3d 482, 489 (Mo. App. W.D. 2008).

Point VI is denied.

In his final point, Husband challenges the order to pay half of Wife's attorney fees. The trial court has broad discretion in awarding attorney fees, and we will not overturn an award

14

absent a showing that the trial court abused its broad discretion. Goins v. Goins, 406 S.W.3d 886, 891 (Mo. banc 2013). The trial court is considered an expert on attorney fees, and its decision is presumptively correct. Id. "The party contesting the award of fees bears the burden of showing that the trial court abused its discretion." Id.

Wife requested attorney fees in the prayer for relief of her petition for dissolution, which was filed in January of 2012. After his motion regarding venue was resolved—including writ proceedings thereon—Husband filed an answer asking the court to deny all relief requested in the petition. In the PDL judgment, entered in December of 2012, the trial court noted that the parties consented to reserve any claim of attorney fees for the hearing on the merits set for February 2013. After Husband's first motion to continue was granted and the case reset to May of 2013, Wife filed her answers to interrogatories indicating that she was not requesting attorney fees. Thereafter, Husband sought a protective order, filed another motion to continue and requested cancellation of the special master session that had been set. By the time mediation was ordered instead, it was November of 2013. The trial was finally held in April 2014.

At trial, Wife testified that she was seeking attorney fees, as she had pled, in the amount of $10,000. She had arranged to pay counsel a modified flat fee at different stages of the proceedings. Wife explained that initially she paid counsel $5,000 and then, because the case was extended, had to pay another $5,000. She got some of the money to pay this fee from her grandparents. Wife testified that counsel's fee was fair and reasonable considering the time spent in court and depositions and the other work he did as reflected in the court's docket sheets. But she testified that she ended up incurring more fees than were necessary because of the length of the case, which Wife testified was neither her nor her attorney's fault. There was no itemized statement of counsel's work on this case. Instead, counsel asked the trial court to take judicial notice of its file, which the court did without any objection from Husband.

The trial court stated in its judgment that it had considered all of the factors in section 452.355.1, which authorizes an award of reasonable attorney fees in dissolution cases after the court considers "all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action." The court stated that it had considered Wife's testimony regarding her fee arrangement and the amount she paid and found the $10,000 reasonable. The court expressly considered the following: the "contentious and protracted" nature of the litigation, beginning immediately with the venue issue; the repeated continuances at Husband's request, which increased counsel's trial preparation time; the depositions, the cancellation of the special master session at Husband's request and the unsuccessful mediation; and the lack of any apparent disagreement at the time of Husband's deposition regarding child custody, visitation or division of property. Finally, taking into account the division of property and the 2011 tax refund, the trial court concluded that Husband should pay $5,000, which was half of the fees requested by Wife.

On appeal, Husband first contends that Wife should be estopped from seeking attorney fees because she stated in her interrogatory that she was not requesting them. Husband provides no legal authority for this contention. Moreover, he has demonstrated no equitable reason for estopping Wife's request under the circumstances of this case, particularly where it does not appear that Husband relied in any way on her interrogatory answer. Rather, Husband was on notice from Wife's pleadings and testimony at trial that she was seeking attorney fees and he did not object to litigating this issue—on the basis of an inconsistency between the petition and an interrogatory answer or otherwise—at any point during the trial. In fact, it was not until a post-trial memorandum of law that Husband challenged Wife's request for attorney fees on the ground that she had not answered her interrogatory "truthfully and honestly."

Husband also argues that the award was erroneous because the court did not make a finding that the case involved unusual circumstances before awarding attorney fees. The

16

American rule requires each party to pay his or her own attorney fees unless there is a statute or contract authorizing an award of fees or in the case of unusual circumstances. In dissolution cases, section 452.355.1 provides the statutory authority and standard for awarding fees. Therefore, it is unnecessary and inappropriate to address whether the case also involves unusual circumstances. Despite the existence of this statute since 1974, the numerous cases properly using the standards set forth therein without reference to unusual circumstances and the repeated and explicit rejection of this argument by several courts over the years, there remain several diverging strains of cases approving of the unusual circumstances standard in dissolution cases. We take the opportunity here to examine briefly how this came to be and to take measures to prevent it from continuing.

The first case after the enactment of section 452.355.1 in 1974[4] to use the unusual circumstances standard despite the existence of the statute was In re Marriage of Hoglen, 682 S.W.2d 179, 182 (Mo. App. S.D. 1984). That case did not mention the statute and held that attorney fees are only justified upon a showing of "very unusual circumstances." Id. (citing non-dissolution case in support). Hoglen was cited repeatedly over the next ten years for the proposition that unusual circumstances are required to award attorney fees in a dissolution case—sometimes in addition to the statutory factors and sometimes with no mention of the statute. See, e.g., Amedei v. Amedei, 801 S.W.2d 491, 494 (Mo. App. W.D. 1990) and Echele v. Echele, 782 S.W.2d 430, 441 (Mo. App. E.D. 1989).

In 1993, it was expressly stated for the first time that section 452.355.1 "contains no requirement of unusual circumstances." Dimmitt v. Dimmitt, 849 S.W.2d 218, 222 (Mo. App. S.D. 1993). The next year, the court in Ansevics v. Cashaw expressly ordered that Hoglen and other cases adopting the unusual circumstances standard "should not be followed." 881 S.W.2d

---

[4] When enacted, the statute provided only that the court consider "all relevant factors including the financial resources of both parties" when ordering reasonable attorney fees. In 1998, the following factors were added: "the merits of the case and the actions of the parties during the pendency of the action."

247, 251 (Mo. App. W.D. 1994) (noting Hoglen's reliance on declaratory judgment case using unusual circumstances standard was misplaced).[5]

But reliance on the unusual circumstances standard nevertheless persisted, and courts continued to cite the cases that should not have been followed any longer under Ansevics.[6] So began a new line of opinions relying on these more recent cases, most of which were seemingly unaware of the earlier cases denouncing this proposition.[7] That said, many cases after Ansevics heeded that court's direction—or independently rejected arguments for the unusual circumstances standard—and relied solely on the statutory authority and standards therein when awarding attorney fees in dissolution cases.[8] Very recently, the Southern District addressed the issue, noting other courts' express rejection of "the very unusual circumstances standard in domestic relations cases brought under Chapter 452" and pointing out cases that held section 452.355.1 "contains no requirement of unusual circumstances." Stroh v. Stroh, 454 S.W.3d 351, 364 (Mo. App. S.D. 2014). Although this and other clear pronouncements should be sufficient to preclude further reliance on the unusual circumstances standard in the future, history had proven otherwise.

The perpetuation of this incorrect standard of law stems in part from the different lineages of case law on the topic. Therefore, in an effort to prevent future citation to cases

---

[5] These are the cases that should not have been followed on this point after Ansevics: Campbell v. Campbell, 825 S.W.2d 319, 323 (Mo. App. W.D. 1992); Kovacs v. Kovacs, 869 S.W.2d 789, 794 (Mo. App. W.D. 1994); Summerville v. Summerville, 869 S.W.2d 79, 84 (Mo. App. W.D. 1993); Hott v. Hott, 865 S.W.2d 449, 450 (Mo. App. S.D.1993); Mudd v. Mudd, 859 S.W.2d 699, 703 (Mo. App. E.D. 1993); Pasley v. Patton, 855 S.W.2d 385, 389 (Mo. App. W.D. 1993); Gable v. Gable, 816 S.W.2d 287, 292 (Mo. App. W.D. 1991); Amedei, 801 S.W.2d at 494; Echele, 782 S.W.2d at 441; Lyles v. Lyles, 710 S.W.2d 440, 444 (Mo. App. E.D. 1986).

[6] See In re Marriage of Glueck, 913 S.W.2d 951, 957 (Mo. App. E.D. 1996) (citing Campbell); see In re marriage of Baker, 986 S.W.2d 950, 958 (Mo. App. S.D. 1999), In re Marriage of Thompson, 24 S.W.3d 751, 756 (Mo. App. S.D. 2000) and Reiter v. Reiter, 372 S.W.3d 899, 906 (Mo. App. W.D. 2012) (all citing Echele).

[7] See Schwartzkopf v. Schwartzkopf, 9 S.W.3d 17, 24 (Mo. App. E.D. 1999) (citing Baker); Myers v. Myers, 47 S.W.3d 403, 410 (Mo. App. S.D. 2001) and Pierce v. Pierce, 215 S.W.3d 263, 268 (Mo. App. S.D. 2007) (citing Thompson); Deck v. Deck, 64 S.W.3d 870, 876 (Mo. App. E.D. 2002), Bonenberger v. Bonenberger, 108 S.W.3d 729, 735 (Mo. App. E.D. 2003) and Lagermann v. Lagermann, 109 S.W.3d 239, 244 (Mo. App. E.D. 2003) (all citing Schwartzkopf); Pecher v. Pecher, 398 S.W.3d 580, 586 (Mo. App. W.D. 2013) (citing Reiter); Elnicki v. Caracci, 445 S.W.3d 59, 74 (Mo. App. E.D. 2014) (citing Pecher).

[8] See, e.g., Weston v. Weston, 882 S.W.2d 337, 342 (Mo. App. S.D. 1994); Halupa v. Halupa, 943 S.W.2d 272, 279 (Mo. App. E.D. 1997); Osborne v. Osborne, 978 S.W.2d 786, 789 (Mo. App. W.D. 1998).

already deemed bad law on this issue and further misstatement of the appropriate standards for awarding attorney fees in dissolution cases, we expressly hold that the cases cited in footnotes 7 and 8 should no longer be followed for the incorrect proposition that unusual circumstances are required to award attorney fees in dissolution cases. And, of course, Ansevic remains valid law and precludes reliance on the cases cited in footnote 6 for that proposition as well.

Completely outside any of these lines of cases is the case cited by Husband in his brief, which he admitted at oral argument may not be the most accurate statement of the law. In Maurer v. Maurer, this Court affirmed the trial court's denial of attorney fees because there were no unusual circumstances. 383 S.W.3d 21, 32-33 (Mo. App. E.D. 2012). That opinion did not refer to section 452.355.1 and instead cited Hihn v. Hihn, 237 S.W.3d 607 (Mo. App. E.D.2007). Hihn held that the trial court had failed to properly consider the financial resources of both parties under section 452.355.1 and then "additionally" noted that there was no evidence of unusual circumstances. Id. at 609-11 (citing non-dissolution case in support). We find Hihn's use of the unusual circumstances standard unnecessary and Maurer's reliance thereon misplaced. Neither of those cases should be followed any longer either for the proposition that unusual circumstances must be proven before awarding attorney fees in a dissolution case.

The majority of cases since the enactment of the statute have correctly—and without any reference to unusual circumstances—stated that attorney fees in a dissolution case need only be analyzed using the factors listed in section 452.355.1. This includes, most notably, all of the Supreme Court cases on this issue. See e.g. Goins, 406 S.W.3d at 891; Russell v. Russell, 210 S.W.3d 191, 199 (Mo. banc 2007). Under section 452.355.1, the court may consider "all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action." How the factors balance will vary from cases to case. Kieffer v. Kieffer, 590 S.W.2d 915, 919 (Mo. banc 1979).

The trial court in this case expressly indicated that it considered all of the factors under this statute. Husband claims there was no evidence of Husband's ability to pay this award and no indication as to what financial resources the trial court considered. Although the trial court did not specifically cite the financial resources of the parties in the paragraph of the judgment addressing attorney fees, that is not fatal to the award. We presume the trial court considered the evidence it had set forth elsewhere in the judgment as to Wife's income and Husband's imputed income. That evidence came from both the parties' testimony and their statements of income and expenses. This is sufficient evidence of the parties' finances, and more detailed or extensive information is not required. See Alberswerth v. Alberswerth, 184 S.W.3d 81, 94 (Mo. App. W.D. 2006). That evidence shows that Husband has a greater ability to pay given his imputed income of $1300 a month compared to Wife's $360 monthly income. Wife was not required to show a financial inability to pay attorney fees, and Husband's greater ability to pay "is sufficient to support an award of attorney fees." Russell, 210 S.W.3d at 199.

Husband also takes issue with the notion that his requests for continuances or the filing of the writ increased Wife's litigation costs. But Husband's conduct during the litigation is a relevant factor, properly considered by the trial court in this case. Since the trial court is in a better position to judge the credibility and sincerity of Husband's actions during the litigation, we defer to its conclusion that Husband's conduct unnecessarily increased the length of this case. See T.B.G. v. C.A.G., 772 S.W.2d 653, 655 (Mo. banc 1989).

Husband claims that the trial court's statement regarding the parties' agreements at the time of his deposition is completely erroneous. His argument relies entirely on the notion that Wife's counsel asked him poor questions at the deposition and is otherwise unsupported. Likewise he does not support his claim that the award was excessive, even though it was only half of the attorney fees.

20

In sum, Husband has wholly failed to demonstrate an abuse of discretion or otherwise overcome the presumption that the trial court's decision on attorney fees was correct.

Point VII is denied.

The judgment is affirmed.

ROBERT G. DOWD, JR., Judge